**REVISED**

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 95-31047
_____


OXY USA INC;

      Plaintiff - Counter Defendant - Appellant


MOBIL EXPLORATION AND PRODUCING U.S., INC.; CHEVRON USA INC

      Plaintiffs - Appellants

v.

BRUCE BABBITT, Secretary Department of the Interior;
DEBORAH GIBBS TSCHUDY, Chief Royalty Valuation and
Standards Division Minerals Management Service Department
of Interior; CYNTHIA QUARTERMAN, Director, Minerals
Management Service, Department of the Interior

      Defendants - Counter Claimants - Appellees


_____

Appeal from the United States District Court
for the Western District of Louisiana
_____
September 8, 1997

Before KING, SMITH, and WIENER, Circuit Judges.


KING, Circuit Judge:

    This is an appeal of a grant of summary judgment in favor of

the government upon review of an alleged final determination of the Department of the Interior. For the reasons that follow, we vacate the judgment of the district court as it relates to Count III and remand for entry of judgment dismissing Count III with prejudice.

I. BACKGROUND

OXY USA, Inc., Mobil Exploration & Producing U.S., Inc., and Chevron U.S.A., Inc. (collectively, the "Companies") are lessees under several oil and gas leases involving submerged lands in the Outer Continental Shelf ("OCS") lying seaward of the State of Louisiana.[1] The oil and gas leases implicated by this action were granted by the State of Louisiana on the 1942 Louisiana State Lease form (the "1942 lease form") at a time when Louisiana claimed jurisdiction over submerged lands in the Gulf of Mexico. After a series of Supreme Court decisions established that the United States had exclusive jurisdiction over submerged lands seaward of the low-water line,[2] Congress enacted the Outer Continental Shelf Lands Act ("OCSLA" or the "Act"), 43 U.S.C. §§ 1331-1356, which enabled the United States both to issue new mineral leases on the lands under its jurisdiction and to

---

[1] Congress has defined the term "Outer Continental Shelf" to include all submerged lands lying seaward and three miles outside state waters, "and of which the subsoil and seabed appertain to the United States and are subject to its jurisdiction and control." 43 U.S.C. § 1331(a).

[2] See United States v. Texas, 339 U.S. 707 (1950); United States v. Louisiana, 339 U.S. 699 (1950); United States v. California, 332 U.S. 19 (1947).

validate and maintain as federal leases existing state-issued mineral leases covering OCS lands.  The leases between the State of Louisiana and the Companies were validated pursuant to section 6 of the OCSLA, id. § 1335.  The Companies accordingly pay royalties to the United States on production from these leases.

The OCSLA vests authority for administering federal OCS mineral leases in the Secretary of the Interior.  Id. § 1334. The Minerals Management Service ("MMS") within the Department of the Interior ("DOI") is responsible for valuing production from federal oil and gas leases and collecting royalties on that production.  See 30 C.F.R. pts. 201-203, 206.[3]  The Royalty Valuation and Standards Division ("RVSD")[4] of the MMS is responsible for responding to requests by federal OCS lessees to deduct transportation costs from royalty payments.

Section 6(b) of the OCSLA provides that the original royalty provisions of state-issued leases validated under section 6

---

[3]  The Minerals Management Service was established on January 19, 1982, by Department of the Interior Secretarial Order No. 3071.  See 47 Fed. Reg. 6138 (1982).  The Director of MMS operates under the supervision of the Minerals Management Board, also established by Order No. 3071, which is chaired by the Under Secretary of DOI.  DOI Secretarial Order No. 3071, Amend. No. 1 (May 10, 1982).  The stated purpose of establishing a Minerals Management Board and MMS was to "1) improve the management of and provide greater management oversight and accountability for the minerals-related activities previously carried out by the Conservation Division of the U.S. Geological Survey; and 2) to eliminate the fragmentation of Outer Continental Shelf (OCS) activities by consolidating the responsibility for OCS programs." Id.  Royalty management is one of the major functions of MMS. See DOI Secretarial Order No. 3071, Amend. No. 2 (May 26, 1982).

[4]  This division is now known as the Valuation and Standards Division.  We use the former nomenclature in this opinion as it was in effect when the actions challenged herein occurred.

3

continue to govern. 43 U.S.C. § 1335(b). The regulations issued pursuant to section 6 provide, in relevant part, that the royalty provisions of leases maintained under section 6 (subject to certain provisions of section 6(a) not relevant here) "shall continue in effect, and, in the event of any conflict or inconsistency, shall take precedence over these regulations." 30 C.F.R. § 256.79. Accordingly, the royalty provisions of the 1942 lease form govern the calculation of royalties due the federal government under the section 6 leases at issue in this suit. The royalty provisions of the 1942 lease form are as follows:

> Should sulphur, potash, oil, gas and/or other liquid hydro-carbon mineral be produced in paying quantities on the premises hereunder, then the said lessee shall deliver to lessor as royalty, free of expense:

> One eighth (1/8) of all oil produced and saved, including distillate or other liquid hydro-carbons, delivery of said oil to be understood as made when same has been received by the first purchaser thereof. Or lessee may, in lieu of said oil delivery, and at its option, pay to lessor sums equal to the value thereof on the premises; provided no deductions or charges shall be made for gathering or transporting said oil to the purchaser thereof, or loading terminal, nor shall any deductions whatsoever be made chargeable to lessor; provided further, that the price paid lessor for said oil shall not be less than the average posted pipe-line or loading terminal price then current for oil of like grade or quality.

> One-eighth (1/8) of all gas produced and saved or utilized, delivery of said gas to be understood as made when same has been received by the first purchaser thereof. Or lessee may, in lieu of said gas delivery, and at its option, pay to lessor sums equal to the value thereof at the well, provided no gathering or other charges are made chargeable to lessor; provided further that the price paid lessor for said gas shall not be less than the average price then current for gas of like character or quality delivered to the pipe line purchaser in that field.

4

The procedural history of this case begins with a 1985 request by OXY's corporate predecessor, Cities Service Oil and Gas Corporation ("Cities"), for a transportation allowance for production during 1984 under leases OCS-G 0146 and OCS-G 0163. By letter dated May 30, 1985, the Chief of the RVSD approved this request and stated that the 1984 transportation allowance was to be used as a tentative allowance for production during calendar year 1985. Cities subsequently requested, in a series of letters and a meeting with RVSD officials, that the transportation allowance for 1985 be increased to reflect actual transportation costs for gas production during that year. By letters dated July 21, 1986, and September 19, 1986, the Chief of the RVSD denied Cities's requests and also rescinded the RVSD's earlier approval of the 1984 transportation allowance. Both letters stated that leases OCS-G 0146 and OCS-G 0163 were not eligible for transportation allowances as a result of their section 6 status.[5]

Cities appealed the RVSD's decision to the Director of MMS pursuant to 30 C.F.R. § 290.3. The Director affirmed. OXY then appealed the decision of the Director to the Interior Board of Land Appeals ("IBLA") pursuant to 30 C.F.R. § 290.7 and 43 C.F.R. pt. 4. In an order issued on October 19, 1992 (the "OXY

---

[5] The findings and conclusions attached to the July 21 letter based this determination on the following language in the oil royalty clause of the 1942 lease form: "provided no deductions or charges shall be made for gathering or transporting said oil to the purchaser thereof." The findings and conclusions attached to the September 19 letter based the same determination on a similar provision in the gas royalty clause of the 1942 lease form: "provided no gathering or other charges are made chargeable to lessor."

5

decision"), the IBLA affirmed the decision of the Director.  The IBLA based this decision in part upon its holding in Exxon Company, U.S.A., 118 IBLA 30 (1991) (the "Exxon decision"), that a federal lessee may not deduct transportation costs from royalty payments under the 1942 lease form.

In 1992, OXY, Mobil, and Chevron each requested transportation allowances for a number of section 6 leases originally issued on the 1942 lease form.  By letters dated January 28, 1993, January 22, 1993, and January 14, 1993, the Chief of the RVSD informed OXY, Mobil, and Chevron, respectively, that these leases were not eligible for transportation allowances and that their applications for transportation allowances accordingly were denied.  Each letter stated that the lessee had a "right to appeal this decision" and referred to the procedures for appeal to the Director of MMS set forth in 30 C.F.R. pt. 290. We are not able to determine from the record or the briefs on appeal whether OXY pursued its administrative appeal.  Chevron settled this matter with DOI.  Mobil pursued its appeal to the Director of MMS, and filed with its appeal all of the evidence which Mobil contends should have been reviewed by the district court in this case.  The Director denied Mobil's appeal on February 28, 1995.  Mobil subsequently appealed to the IBLA, which has suspended consideration pending resolution of this suit.[6]

_____

[6]  Although they allege present injury, the Companies do not discuss the mechanics of making royalty payments and requesting transportation allowances as regulated by DOI.  The Companies

The Companies filed this suit against the Secretary of the Interior, the Director of the Minerals Management Service, and the Chief of the Valuation and Standards Division (collectively, the "government") in federal district court on July 15, 1993, pursuant to OCSLA, the Federal Oil and Gas Royalty Management Act of 1982, 30 U.S.C. §§ 1701 et seq., and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 et seq. Counts I and II of the complaint consist of challenges by OXY to the IBLA's OXY decision. Count III -- the claim at issue in this appeal -- is a more broad-based challenge by all the Companies to an alleged blanket determination by DOI that gas transportation costs are not deductible under the 1942 lease form.[7] Count III states:

> The DOI's determination that, as a matter of law, OCSLA Section 6 lessees operating under the 1942 Louisiana State Lease form, such as OXY, Mobil and

assert, without reference to applicable regulations, that

> because of Interior's interpretation of the law, all three of the appellants are unable to take transportation allowances to which they claim an entitlement under their lease terms and the OCSLA. Mobil has administrative appeals pending which challenge the agency's interpretation of the law. It currently is taking the contested deductions, but it had to file substantial surety bonds in order to do so during the pendency of its appeals. Chevron has not taken the contested deductions, and, as a result, it has paid more royalties than are due. It will be entitled to a refund in the event that the lower court's ruling in this case is reversed.

Pls.'s Supp. Ltr. Brief, at 17 (footnotes omitted). DOI does not dispute this scenario.

[7] No party challenges the Secretary's authority to interpret the terms of a section 6 lease pursuant to his authority, under 43 U.S.C. § 1334, to administer federal OCS mineral leases.

7

> Chevron, are not entitled to deduct gas transportation costs from their royalty payments is arbitrary, capricious, an abuse of discretion, and/or otherwise not in accordance with law.

The complaint requests "a declaratory judgment that it is unlawful for the DOI to reject transportation allowances solely on the basis that OCSLA Section 6 leases granted on the 1942 Louisiana State Lease form preclude the deduction of gas transportation costs from lessee's royalty payments."

According to the factual allegations of the complaint, the "determination" challenged in Count III is "revealed by" a series of past DOI decisions. Paragraphs 22-24 of the complaint recount the IBLA's Exxon decision, the IBLA's OXY decision, and the RVSD's January 1993 denials of the Companies' 1992 requests for transportation allowances. Paragraph 25 alleges that "[t]hese DOI actions reveal that a final determination has been made by the DOI that, as a matter of law, OCSLA Section 6 leases granted on the 1942 Louisiana State Lease form prohibit the deduction of any gas transportation costs from a lessee's gas royalty payments."

In its answer to paragraph 25, the government "admit[s] that DOI has made a final determination but aver[s] that the IBLA decision speaks for itself and is the best evidence of its contents." The government subsequently filed with the district court the administrative record of the IBLA's OXY decision. No other administrative record was filed. The government has maintained throughout this litigation that any judicial review conducted with respect to Count III should be limited to the

8

administrative record of the OXY decision.

The Companies moved for partial summary judgment on Count III on October 13, 1993. The Companies argued that DOI's "final, judicially reviewable decision that, as a matter of law, the language of this particular lease form precludes the allowance of a transportation deduction" is unlawful. In support of their motion, the Companies offered at least two documents not contained in the administrative record of the OXY decision -- a 1966 resolution of the Louisiana State Mineral Board ("LSMB") and a response by the State of Louisiana to an interrogatory propounded in other litigation -- which indicated that the State permits lessees under the 1942 lease form to deduct gas transportation costs in certain circumstances. The government filed a cross-motion for summary judgment on all counts in which it argued that DOI properly construed the gas royalty clause of the 1942 lease form. Citing the APA, the government urged the district court to limit its review to the administrative record in the OXY decision and to decline to consider the 1966 LSMB resolution and the answers to interrogatories proffered by the Companies. The Companies replied that Count III was not a suit for judicial review of agency action pursuant to the APA, but was a citizen suit under section 23(a) of OCSLA, 43 U.S.C. § 1349(a), and as such was not subject to the record-review requirements of the APA.

The district court issued an interlocutory ruling on December 1, 1994, granting summary judgment in favor of the

government on Count III. The court limited its review to the administrative record of the OXY decision. The court stayed its consideration of Counts I and II, at the request of the parties, pending settlement negotiations between OXY and DOI.

OXY and DOI reached a settlement with respect to the OXY decision several months later. The Companies thereupon attempted to extricate themselves from the unfavorable result of their efforts and promptly moved to dismiss all three counts of the complaint and to vacate the December 1, 1994, interlocutory ruling. The Companies contended that, in light of the district court's decision to limit its consideration of Count III to the administrative record in the OXY decision, the settlement of that decision rendered Count III moot. The government opposed the motion to dismiss Count III and vacate the summary judgment ruling. The district court granted the Companies' motion and entered an order on July 25, 1995, dismissing all counts and vacating the December 1 interlocutory ruling. The government moved for reconsideration, arguing that settlement of the OXY decision did not render Count III moot because "a substantial controversy remains over the broad issue of Interior's interpretation that the costs of gas transportation are not deductible under the terms of the 1942 lease" and that DOI "should not be made to defend its position regarding transportation costs repeatedly and piecemeal." Upon consideration of this motion, the district court vacated its July 25 dismissal of Count III and reinstated the December 1 ruling.

10

The district court entered judgment in favor of the government as to Count III on September 22, 1995.

## II. THE CITIZEN SUIT AS AN AVENUE OF APPEAL

The Companies raise three issues on appeal: (1) whether the district court erred by limiting its review of Count III to the OXY decision and the administrative record compiled therein, (2) whether, having limited its review to the OXY decision, the district court erred by issuing a final judgment on Count III following settlement of the OXY decision between OXY and DOI, and (3) whether the district court erred in upholding DOI's determination that transportation costs are not deductible under the 1942 lease form.[8]

The principal basis for the Companies' position that the district court should have considered evidence outside of the OXY administrative record is that Count III alleges a cause of action under the citizen suit provision of OCSLA, 43 U.S.C. § 1349(a), and therefore is not confined to any particular administrative record. Because the original briefs did not address adequately the Companies' contention that Count III is "independently sustainable" under the citizen suit provision, this court requested supplemental briefing on the issue. The supplemental briefs have appreciably clarified the arguments on appeal.

---

[8] Because we conclude that the district court should have dismissed Count III, we do not reach the substantive issue of whether the district court erred in upholding DOI's determination that gas transportation costs are not deductible under the 1942 lease form.

11

Notwithstanding its posture in the district court, the government now contends that the citizen suit provision may not be used to challenge the Secretary's interpretation of the 1942 lease form because the act of interpreting the 1942 lease form is a necessary duty undertaken in the Secretary's administration of the OCSLA and cannot constitute a "violation" as contemplated by the citizen suit provision.  The government argues in the alternative that even if the citizen suit provision is a proper vehicle for challenging a decision of the Secretary rendered in fulfillment of his duties under the Act, judicial review of any such decision must proceed in accordance with the standards and procedures set forth in the APA.

The Companies maintain that the citizen suit provision is a proper vehicle by which OCS lessees may challenge the Secretary's interpretation of royalty obligations as violating OCSLA, its implementing regulations, or an OCS lease.  The Companies further contend that the OCSLA citizen suit provision displaces APA concepts of final agency action, exhaustion of administrative remedies, and judicial review limited to the administrative record.

We first consider whether Count III states a claim under the citizen suit provision of OCSLA.[9]  As it turns out, as regards

---

[9]  "In appraising the sufficiency of the complaint we follow . . . the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  Conley v. Gibson, 355 U.S. 41, 45-46 (1957).

12

the Companies, that is all we need decide.

Enacted as section 23(a) of the 1978 amendments to OCSLA, the citizen suit provision establishes a mechanism by which citizens, including lessees, employees, and local and state governmental officials, can participate in the Act's enforcement. See H.R. REP. NO. 95-590, at 161 (1977), reprinted in 1978 U.S.C.C.A.N. 1450, 1566-67.  Section 23 (a) provides, in relevant part:

> [A]ny person[10] having a valid legal interest which is or may be adversely affected may commence a civil action on his own behalf to compel compliance with this subchapter against any person, including the United States, and any other government instrumentality or agency (to the extent permitted by the eleventh amendment to the Constitution) for any alleged violation of any provision of this subchapter or any regulation promulgated under this subchapter, or of the terms of any permit or lease issued by the Secretary under this subchapter.

43 U.S.C. § 1349(a)(1).  The legislative history makes clear that citizen suits can be brought against any governmental agency, "including the Department of Interior or other agencies or departments with regulatory or enforcement authority as to OCS activities" alleged to be in violation of the Act, its implementing regulations, or the terms of any lease or permit issued under the Act.  H.R. REP. NO. 95-590, at 161, reprinted in 1978 U.S.C.C.A.N. at 1567.

For purposes of this case, we will assume without deciding

---

[10]   The Act defines "person" to include "a natural person, an association, a State, a political subdivision of a State, or a private, public, or municipal corporation."  43 U.S.C. 1331(d). The government concedes that federal lessees are "persons" as defined by the Act.

that section 23(a) creates a right of action under some circumstances to challenge the Secretary's interpretation of the terms of a section 6 lease as a violation of OCSLA or the lease terms. The question is whether this is one of those circumstances.

As we have indicated, Count III purports to challenge an alleged "final determination" of DOI that gas transportation costs are not deductible from royalty calculations under the 1942 lease form. This "final determination" is allegedly "revealed" by a series of past DOI decisions in individual cases, although Count III does not challenge these individual decisions per se. As the Companies emphasize in their opening brief on appeal, their motion for partial summary judgment on Count III "was not for judicial review of the OXY Decision, but rather, in keeping with Appellants' broader action stated in Count III, Appellants sought a broader review of Interior's 'final determination.'" The Companies further state in their reply brief that

> Interior erroneously characterizes Appellants' Count III claim as seeking judicial review of the agency's Exxon decision. Appellants recognize that they were not parties in the Exxon appeal. However, Appellants have had their transportation allowance requests denied based on the agency's final determination through the Exxon and OXY Decisions; and this final agency determination entitles them to the declaratory relief sought in Count III.

While the "final determination" challenged in Count III is "revealed by," "reflected in," and otherwise manifested "through" the *OXY* decision, the *Exxon* decision, and the RVSD's 1993 denials of transportation allowances requested by OXY, Mobil, and Chevron

14

in 1992, it does not consist of any agency action apart from these decisions. No party claims that DOI has issued a rule, regulation, or general statement of policy definitively interpreting the gas royalty clause of the 1942 lease form. To the contrary, the record reflects that DOI has heretofore determined the appropriateness of gas transportation allowances under leases issued on the 1942 lease form on a case-by-case basis with due regard to the particular administrative record before it in any given instance.

The Companies essentially have extracted, for lack of a better term, a "rule of decision" from a series of DOI decisions -- both final and nonfinal, and not all involving parties to this suit -- and injected this "rule of decision" into the judicial review process as a "violation" of OCSLA and the lease terms within the meaning of the citizen suit provision. In effect, the Companies are attempting to use the citizen suit provision as an avenue of obtaining judicial review of OCSLA-related agency decisions that is wholly independent of the judicial review procedures set forth in the APA.[11] The review sought by the

---

[11] The Companies have not put all their eggs in the citizen suit basket. They apparently predicate their claim for relief from DOI's alleged "final determination" also on § 704 of the APA, 5 U.S.C. § 704, although this is not clear either from the complaint or from their briefs (which occasionally use the term "supported by" as regards § 704). The Companies disclaim any intent to limit their § 704 claim to the OXY decision or the administrative record that supports it. Rather, they assert that "[b]ecause the OXY Decision is not the only component of the final agency determination that Appellants challenge, the OXY Decision cannot limit the scope of judicial review." They cite no authority for this novel claim under § 704, and it is meritless.

15

Companies, moreover, is de novo -- not limited to the administrative record and not subject to the "arbitrary and capricious" standard of review as required by the APA.  In fact, the Companies emphasize in their opening brief that "[t]he _very reason_ for Appellants' joint action was to demonstrate, based on evidence _not included_ in Interior's decisions, the unlawfulness of Interior's final determination that gas transportation costs are not deductible."

Significantly, although the Companies go to some lengths to make clear that they are not appealing the OXY decision or the RVSD's 1993 denials of their 1992 requests for transportation allowances, the inescapable fact is that they seek to overturn the results of the OXY decision and the RVSD's 1993 denials. These decisions either have been settled or, by their own terms and under applicable regulations, are subject to further review within the agency.[12]  See 30 C.F.R. §§ 290.1 - 290.7; 43 C.F.R. § 4.21(c).

We do not think that Congress intended for the citizen suit provision to operate either as a means of obtaining "umbrella"

---

[12]  The OXY decision and the dispute arising from the RVSD's January 1993 denial of Chevron's 1992 request for a transportation allowance have been settled and therefore are moot as to those parties.  See ITT Rayonier, Inc. v. United States, 651 F.2d 343, 345 (5th Cir. 1981) ("Generally settlement of a dispute between two parties renders moot any case between them growing out of that dispute.  A court finds mootness even if the parties remain at odds over the particular issue they are litigating.").  The RVSD's January 1993 denials of OXY and Mobil's 1992 requests for transportation allowances are, by their own terms, appealable within DOI.  As noted earlier, Mobil has an administrative appeal of this decision pending before the IBLA.

16

review for a series of agency decisions that were or will be
otherwise subject to judicial review under the APA, or as an
express avenue for appealing to the district court an initial
agency decision that is subject to further review within the
agency.  To hold otherwise would be to interpret the citizen suit
provision as implicitly repealing the APA with respect to such
agency action.  It is well-settled that repeals by implication
are not favored.  Watt v. Alaska, 451 U.S. 259, 267 (1981);
United States v. Cavada, 821 F.2d 1046, 1047-48 (5th Cir. 1987).
In construing statutes not entirely harmonious with one other,
courts presume that the legislature intended to maintain
consistency in the law.  1A NORMAN J. SINGER, SUTHERLAND ON STATUTES AND
STATUTORY CONSTRUCTION § 23.09, at 338 (5th ed. 1993).  As this court
has stated,

> [e]ven if two statutes conflict to some degree, they
> must be read to give effect to each, if that can be
> done without damage to their sense and purpose, unless
> there is evidence either in the text of the statute or
> its legislative history that the legislature intended
> to repeal the earlier statute and simply failed to do
> so expressly.

Cavada, 821 F.2d at 1048 (footnote omitted).  The legislature's
intent to repeal must be "clear and manifest."  Watt, 451 U.S. at
267.  The Supreme Court recognized this principle in a recent
decision construing the citizen suit provision of the Endangered
Species Act("ESA"), 16 U.S.C. § 1540(g)(l)(B),(C):

> [I]nterpreting the term "violation" to include any
> errors on the part of the Secretary in administering
> the ESA would effect a wholesale abrogation of the
> APA's "final agency action" requirement.  Any
> procedural default, even one that had not yet resulted
> in a final disposition of the matter at issue, would

17

form the basis for a lawsuit.  We are loathe to produce such an extraordinary regime without the clearest of statutory direction, which is hardly present here.

Bennett v. Spear, 117 S. Ct. 1154, 1166-67 (1997).

We agree with the government that neither the text nor legislative history of section 23(a) manifests congressional intent to repeal the APA in the circumstances present here.[13] The legislative history indicates that the 1978 amendments to OCSLA were intended to expedite development of the OCS as well as to protect the marine and coastal environment.  See H.R. REP. NO. 95-590, at 53, reprinted in 1978 U.S.C.C.A.N. at 1460.  The legislative history provides in relevant part:

> The OCS Lands Act of 1953 has never really been amended and is outmoded.  No legislation exists for coordination and compensation for injury to other users of the OCS besides the oil and gas industry.  No comprehensive national legislation presently exists for responsibility and liability for the effects of oil pollution resulting from activities on the Shelf.  In addition, specific mechanisms are needed to involve states, and local governments within states, in all OCS decisions.

Id.  We recognize that Congress also intended to "[r]educe frivolous lawsuits and delays by providing consolidated and expeditious procedures for citizen suits and judicial review." Id. at 54.  We find no indication in the legislative history, however, that the "delays" referred to are associated with the administrative process, guided by the regulations and the APA,

---

[13]  We emphasize that our decision today is limited to the unique facts of this case.  We do not decide the broader question raised by the parties of whether all judicial review of agency action challenged pursuant to section 23(a) must comport with the requirements of the APA.

18

that has been in effect throughout the life of the OCSLA. Reading the statute and its history as a whole, we are unable to discern a "clear and manifest" intent to provide, via section 23(a), a mechanism by which OCS lessees, situated as are the Companies in this case, could bypass well-established procedures for administrative and judicial review.

## IV. <u>CONCLUSION</u>

For the foregoing reasons, the judgment of the district court is VACATED as to Count III, and this case is REMANDED for entry of judgment dismissing Count III with prejudice. Each party shall bear its own costs.